We have four argued cases this morning. The first is number 23-1622, Google v. MindbaseHQ. Mr. Kelley. Good morning, Your Honors. May it please the Board. The Board was mostly right when it determined that most of Mindbase's claims to databases of words were not patentable. But it erred in two significant respects that led it to the wrong conclusion for the dictionary routine claims and for the claims directed to normalization. For the dictionary routine claims, the flaw in the Board's decision was that it failed to construe the dictionary routine as requiring only the use of a dictionary as a lookup function as opposed to the creation of a dictionary. The Mindbase's patent explains how its dictionary works. It compares an entered word with a word in the dictionary, just like we all do when we use a dictionary, as a lookup function. The Board got to the wrong place, though, because the Board construed the claim or it didn't construe the claim, but it applied the claim as if it required dictionary creation, which it doesn't. And even Mindbase doesn't. Does the specification describe both dictionary creation and lookup? It describes the use of the dictionary to look up the word that's entered, and it does have discussions about dictionary creation, but the claim limitation is about the lookup function. That's consistent with what Mindbase put in its infringement contentions that it served us with. In fact, Mindbase has been able to never take a position on whether or not its claims are broad enough to read simply on a lookup function. But the claim limitation is a dictionary routine for automatically classifying and storing words. In your construction, what is the classifying and storing? What is the automatic classifying and storing? It's the return of the definition that's in the Conlin database. So yes, it talks about automatically classifying, and the way the Board and Mindbase sort of gets around Conlin is Conlin uses the phrase semi-automatic. And Conlin used that phrase in terms of how it creates its Table 3. Now what Conlin does is it starts with dictionary definitions from multiple databases. It pulls them in. That's in Conlin's Table 2. And then through methods it calls semi-automatic, it creates its Table 3. That's the table that's in the Conlin database that's used to provide the definitions of terms. And it's in that Table 3 that we see the classifications that correspond to the types of words in Claim 43 that have to do with, I'm sorry, in Claim 14, that have to do with verbs. They have to do with tangible objects. Those are the classifications that need to be returned. I think there's just another way of asking the same question. But at page 43 the Board says in mapping this limitation 14.3, which I think is the one we're talking about, onto Conlin, Petitioner has not shown how looking up a word, for example the word chip, discloses limitation 14.3 in part because Petitioner and your expert have not explained how yielding the word's definition and lexical information and storing that query discloses automatically classifying and storing words entered into said database. I think you feel you've already answered that question, but can you try again and help me understand your answer to that? Absolutely, Your Honor. So in that part of the decision that the Court is just reading, that's the part where the Board purported to accept our construction and said, well, even under your construction Conlin doesn't do it because of the automatically classifying part. The problem with that analysis is that if you agree with our construction that getting the dictionary to return the definition is within the scope of our construction, then if that definition includes the classification of the word, in other words if it's a verb or a tangible object, that gets returned with the definition, that is the classification. So the word that got put in is automatically classified in the sense that the classification is returned by the dictionary. The classification is telling the user what type of word it is. Yes. It's a noun, it's a verb, it's a whatever. Right, and that's what's in Conlin's Table 3. And Your Honor, to go back, Judge Teich, to your question about how the MindBase system builds its dictionary, you'll see an example at the bottom of Column 14 where MindBase discusses this return of the classification of the word. And MindBase gives an example involving a red car. And it says, well look, if the person puts in red car as simply a tangible object, the MindBase dictionary will switch that to car. It'll say it's a tangible object and it's just a car. And then it lets the user respond to confirm or to say that that's not correct. So in other words, if the definition with the classification that comes back is somehow flawed, that's when the user's interaction comes in and that can modify MindBase's dictionary. But that suggests that the board's claim construction was wrong in terms of what automatic means. And maybe the semi-automatic feature of Conlin would come within a correct claim construction. No? No, Your Honor, because the semi-automatic function of Conlin has to do with the building of the database, which is, I think, what Your Honor is talking about with that example at the bottom of Column 14. But that, again, is not what the claim is directed to, because the claim is directed to returning the classification, not sort of building the dictionary. And that is precisely how MindBase has carried it. No, I think you misunderstood my question. My question is, looking at the description of dictionary creation in the specification, it seems as though dictionary creation is perhaps not automatic, that it requires user input. So perhaps the board's construction of the word automatic in the claim is wrong, and automatic ought to be allowing for some amount of user input, given the description of dictionary creation in the specification. And that would perhaps mean that under the construction that I'm suggesting, Conlin would disclose dictionary creation. Your Honor, that would be a third construction of the claim. It's frankly not a construction that we've advocated for so far, but I think it illuminates the problem here, is that whatever the board did with this claim was flawed. And what we need is clarity about what this claim term means. Now, Your Honor, I would push back a little bit on that construction, because what the final limitation, Claim 14, is talking about is simply the classification and the storage of the entered word. And to the extent that anything meets the scope of that claim, it wouldn't matter if it's also done semi-automatically. And what I mean by that is even if MindBase has two functions, that is, one is just returning a definition with a classification in it, and the second is adding to the dictionary by doing a semi-automatic sort of correction of the classifications, that it wouldn't matter that that second step is also contemplated by MindBase, as long as the claim covers the first step of just returning the classification, because that's what Conlin does also. But I do understand Your Honor's point. And again, MindBase has been able to remain silent on this throughout this whole proceeding, even in this case. In its red brief, it doesn't take a position on whether or not the claim reads on simply a lookup function. And it's doing that to keep its options open down the line. And it's critical not just for the dispute before the court from the board, but also because of the ongoing district court action that this court, however it views the scope of the claim, provides some clarity to the parties. If we agree that the board didn't actually apply your construction, should you send it back and have the board itself review its construction decision, or are you saying that it should adopt your construction and the alternative? Well, Your Honor, as for our construction argument, I mean that is of course subject to de novo review, and we would advocate for this court adopting our construction, or at least definitively determining what the construction is. And then, yes, a remand would be in order for the board to either apply that construction. And even if that construction can only come out one way, there are claims dependent from Claim 14 that would require further analysis from the board. So a remand. I'm surprised by your answer. I thought you were arguing that it was undisputed that Conlin discloses this limitation under your construction were we to adopt your construction. Well, that's not what the board said. I mean that's certainly what we think, and we think it's very easy to get there. There would still be a remand required, because there are other claims that the board didn't reach. And I guess maybe I didn't say my answer quite correctly. But, yes, on Claim 14, if our construction is correct, there's no other way to read Conlin. Can I ask you on the normalization claims, I understand what the board was saying. I think it is you made a new argument in your reply that wasn't in your petition. Can you show me where in your petition you think you made the argument that the board says was new? Yes. So I'm going to preface this by acknowledging that our petition's discussion of the final three limitations of the normalization claims was, I'll say, terse. And we see this at page 2548 of the record. So the way Claim 43 is written, 2548, Your Honor. So the way Claim 43 is written is that in its initial part of the claim, it has the normalization functions in it. So what we've called deduplicating, what we've called disambiguating, that all occurs in what I'll call the top half of Claim 43, when it compares within each of the databases that are inbound, whether those databases have duplicates or need disambiguating. But once that is done, that's when we get to the final three steps of the claim. And that's what's treated at page 2548, which is page 83 of our record. And yes, we say, okay, once that occurs, in Step 43.3, you compare the normalized databases. And then in Step 43.4, you record the common data elements. And then finally, you just store one location of it. And we cite our expert on each one of those. And our expert cites Fong on each one, and it cites Conlon, and it cites other BART. You don't say anything about inherency, correct? Oh, we do not use that word here, Your Honor, because the theory of our case, and this is what is discussed a little bit higher up, is that it would have been obvious at least to take Conlon, and when doing the normalization, to follow the steps in Fong. So what our expert did is said, okay, if you follow the steps in Fong when doing that normalization, these will be the final three steps. And when the board expressed some uncertainty about that, that's when we came back with the rebuttal declaration, where Dr. Jansen took great efforts to stay true to his original theory, because in each of the three or four paragraphs where he discusses this issue, he begins by quoting the paragraph in his initial declaration. And then he says, okay, here's what I said. Here's what I pointed to. And then, yes, he builds on it by saying, I'm going to use a simple sort of tutorial device. I'm going to use this very simple explanation with apples and oranges and limes, just a few components. And as he goes through, he says, here is how you would do Fong's normalization steps. Well, if we were to assume that the board got it wrong in saying the reply was improper, and we conclude that the reply was proper, what is the board saying about the deficiencies in the reply? I know with respect to one limitation, it says there wasn't any text. It was just a figure. But with respect to the others, what's their view as to what's the matter with the reply showing? Your Honor, I'm not sure I can answer that, because what the board said is it just wasn't going to accept the reply. It wasn't going to consider it. So it didn't go on and say, even if we accept the reply, it's insufficient? No, Your Honor. It said, and this is at page, I believe, 57 of the record. It says, we decline to consider these late arguments and evidence. And that's four lines from the bottom of page 57. So it outright declined to consider a rebuttal declaration that couldn't have been truer to the original declaration. This is exactly why we need rebuttal declarations. This is exactly what parties should be permitted to do. And my base could have cross-examined Dr. Jansen if they thought there was any problems with this rebuttal declaration, and they didn't do so. And unless the Court has any further questions, I'll reserve the final minute. Okay, we'll give you two minutes for rebuttal. Okay, thank you, Judge. Mr. Honor, comments? Good morning, Your Honors. If it pleases the Court, I'll begin. I'll start with the reply evidence. That's what Google led off with. Now, Google argues that their 119-page rebuttal declaration should be admissible because Let's just, passing over the question of the propriety of the reply, let's assume hypothetically that we said the reply is correct. What's the matter on the normalization claims with respect to the reply showing? The argument that Google makes with respect to normalization is that the word normalization exists prior to my base's invention. And that's not in dispute. We don't dispute that. But as far as what they're normalizing, it's the detail of how the board is approaching the normalization, as with some other terms, that they may see that. And that's enough for them. And if I could just make one point on the reply. I'm not understanding your argument. Are you saying that if the reply is accepted, it was sufficient? No. No, the detail is there, again, because the normalization, I know for a lay audience, the normalization is inherent in any database management system. And so it's the details of that that make it specific to a particular invention or version of a DBMS. So, no. So the reply argument testimony is not enough because it merely talks about fall, which is not anticipatory or rendering obvious of the patterns. Normalization, that's the elimination of redundancies, isn't it? That's one of the things. And so for fall, which is a textbook, entry-level textbook, all database management. So that would be different than just plain looking up. Correct. That's an internal process of the database management system. So depending on the structure of that DBMS, you have to have a different normalization process internally. So that's why Mindbase doesn't claim to have invented normalization. They're just showing how they need to normalize their innovative DBMS. I do want to come back to whether the reply was proper or not. It sounded like you might want to get there, too. My first question is, whether it was new or not, is that a matter? I think that's a matter we've reviewed de novo ourselves. Do you agree with that? Yes. Okay. And also, it appears that you did not, or at least I can't find, where you argued to the board that the rebuttal was improperly new. Can you show me where you made that argument, if you did make that argument? I see it 4177 where you responded on the merits. I think we just took it to respond on the merits because we felt that they were still off. You're right. We probably had that procedural avenue that we could have. So the board found it was improper and knew, even though you didn't ask it to do that. I think we argued in the oral hearing at the board that, you know, whether they weighed it lightly or whether they ignored it altogether was up to them. But to your point, we didn't go that route very deeply. Mr. Kelly, tell us, is this like exactly the type of rebuttal or reply declaration that we should want the board to allow? What's wrong with his view on that? Well, so if a petitioner is allowed to reply with 119 papers, that's longer than almost any other document in this whole case. I mean, to me it's facts of Google's trying to game the system, thinking that the respondent is not going to be able to rebut their rebuttal declaration. But they're not relying on any new art in the reply. It's just a question of elaborating on what Fong teaches, right? But this is all expert testimony, right? This is all just expert declarations. Wait, wait, wait. Is my statement correct? That they're just in the reply elaborating on what Fong teaches? Elaborating on a previously disclosed prior art. But the elaborating part, Your Honor, I would say, I mean, this is all new testimony. I mean, these are new charts and graphs. They even used it at the oral hearing. They used it in the briefs here. And we argued that that volume, the 119 pages, was too much on the face of it. How could that be all respondent to just what they had when it's, you know, one of the largest documents in the case? But the board did not, you know, reject this based on the length of it at all. Instead, they described, the board described the new evidence as petitioners were not made in the petition and that at the hearing, petitioners stated that the reply went deeper into the analysis, so the thrust of the analysis did not change. However, the board continues, inherency is not argued in the petition, and we note that the arguments in the reply and evidence relied upon, including a rebuttal declaration, is significantly more detailed. That's at page 55-56. They did consider it. They did go through it and see what was offered. It wasn't a matter just of the time. It wasn't a matter of the length, as we proposed. I'd like to move to another topic. Yeah, you want to talk about the dictionary claims. So claims 43, the dictionary routines, I'm not sure if Google is trying to construe automatically classifying and storing or if they're trying to construe creating. But somehow they've come to the conclusion on their own that those two are not the same. I mean, in the beginning, from the beginning, from the petition, and every step of the way, Google has said, we want to rely on plain and ordinary meaning, and that's what my basis said. But now, you know, they say, well, this construction provides that we'll be right. Where was this construction in the petition? So assume that we feel we have a claim construction dispute in front of us about the claim term automatically classifying and storing words. Do you oppose the construction that Google is presenting, at least to us? I don't think I understand how their reference that uses the word semi-automatically can be automatically. That's an application of the construction. I'm happy to hear what you have to say about that. But do you accept their construction or do you oppose their construction?  We oppose it. So what's wrong with their construction, which says you don't need to create the database. You only have to use it as like a lookup. That's essentially their construction of this term. Like I said, they're trying to construe the word create to not equal. I don't understand what is creating a dictionary. Is that the extent of your objection to their proposed construction? Their reference does not, their prior reference does not literally say it, so they now construe it. And, you know, they're just, you know, I just don't feel, how good is it that creating one interpretation, I'm not paraphrasing the patents here, the claim terms. But creating a dictionary, isn't it classifying, you know, making a determination, a definition of word, and then storing it? Isn't that what creating a definition, creating a dictionary is? So I just don't understand how the A to B, so I disagree with their construction, yes. But my problem was with it. Then how about the application? If we were to disagree with you and adopt their construction of this automatically classifying and storing words term, do you have a contention that Cotman does not disclose or make obvious that limitation under their construction? Cotman, see, to me, Cotman does not make a, it's a collection, I feel like we are getting, the word database here is being used differently. Cotman is using it as a collection of words, Cotman is a collection of information, and the patents are disclosing a DBMS. But to your point, yes, I disagree. Let's say if, I'm sorry, could you repeat the question? Let me ask it this way. There are references I'll give you in Conlin that talk about we can't do certain things automatically, we can only do them semi-automatically. I understand Google to say all of those statements deal with creating a database, not with just merely using it for lookup. Do you agree? I don't mean do you agree that's what they argue, but do you agree that they're right about that? I don't believe that Conlin uses it that way. My first question would be if Conlin does do something automatically, I don't recall anywhere in Conlin that they use that term automatically. They always use the term semi-automatically. It's not like they separate. But do they ever use the term semi-automatically to refer to anything other than creation? As I recall, Conlin uses semi-automatically several times throughout their disclosure. If I could go to... Is it correct, as I was suggesting earlier, that the specifications description of dictionary creation isn't automatic in the sense that it requires user input? I think it describes several ways, and I think it does describe an automatic creation of it, the specification for both patents. I thought the description of the dictionary creation and the specification contemplated user input. Am I wrong about that? I think it describes several ways of doing it, and then I'll get real short. Where does it describe fully automatic? Let me see. One second. Would I be able to find that for you on rebuttal time? Sure. Thank you. And I know you wanted to talk about your cross appeal, which we haven't gotten to yet, so we'll give you a few minutes to do that. Thank you. Well, first, with regard to claims 43 through 46, Google alleges that they... Rather, the board ruled that they've not shown unpatentability for the recording one location of each said common data element. But Google says... The reason is Google relies on... When we look at the experts, Google's experts' declaration regarding Claim 9, Claim 9 is a claim merely that says, each said data element is stored only once. And the expert describes that in a paragraph. And then for Claim 43.5, the expert merely says, as explained above for Claim 9, each data element is stored only once in the main table. But that's not what Claim 43 says. So he's using the same paragraph for Claim 9 for two different claims. Claim 9, as I just said, is each said data element is stored only once. Claim 43.5 is recording one location of each said common data element, each of said databases. And here's the expert explanation. And the same is just as explained above for Claim 9, each data element is stored only once. And the same is true for 44.6. Again, this is a third different type of recording of information. It's not even a data element stored, and it's not only once. It's more detailed. It's more caveated. But they just regurgitate, the expert just regurgitates the same basis for it, and the board pointed that out. The board says, this is the full extent of Google's analysis. This is at page 58, paragraph two. The board says, this is the full extent of Google's analysis of this limitation. Titian did not explain, nor was it readily apparent, how the analysis for Claim 9 and Limitation 10.2 taught the recited limitation in 44.6. And that applies to Claims 43, 45, 43 and 44, of which have two dependent claims, 45 and 46. So for those claims, at least based on those elements, the board has pointed out, exactly, and Google hasn't rebutted, how this one paragraph that their expert used for Claim 9 should apply when the claim terms are all different, 43 through 46. If I could move on to one more point. Well, are you going to discuss the cross bill? I want to get on to this one point. I understand what you're saying. The level of ordinary skill in the art. The citation of supplemental authority and the, it's the same. The PTAB, that decision came down a month after the decision in our case. And the amount of support is the same for there. So one PTAB panel ruled that it was insufficient, conclusory, and the other, another PTAB panel. So, I mean, if there's a disagreement in the PTAB about what is sufficient evidence for a level of ordinary skill in the art. And like I said, I have to mention that the board adopted a level of ordinary skill in the art that includes computational linguistics, computational lexicography, which is terms which have never been defined. And then the board uses this yardstick for all of its unpatentability analyses. The specification, by the way, is just full to references of words that pertain to lexicon. And it talks about verbs and nouns and the different usages. All of that is the stuff that lexicon consists of. So the invention is a database management system and they have to describe it in some way that's not bits and bytes of computer information. And so they've chosen verbs, right? And they've chosen one or two other words. But it's not an entire grammatical endeavor that Conlon is undertaking. It's a DBMS that they just have to describe some way and they've chosen those words for describing it. All right, I think we're out of time. We'll give you a minute for rebuttal. I'm going to cross the panel. Thank you. Mr. Kelly. Thank you, Your Honors. Just three quick points. First, on the dictionary routine, we saw counsel once again try to avoid acknowledging whether or not they believe use of a dictionary is within the scope of the claims. They've tried to avoid saying that through this whole litigation. I think Your Honors saw counsel try to avoid it again here. We need clarity on what the dictionary limitation means and specifically whether it reads on mere use of a dictionary as a lookup table. Second, counsel said repeatedly that the rebuttal declaration was 119 new pages. That's his theme, that it was this huge addition to the record. That's completely inconsistent with the Board's decision. The Board did refer to the rebuttal declaration, but the part it refused to consider was five pages, pages 4110 to 4114, just five pages, just a handful of paragraphs that elaborated in the very same direction, on the very same points that Dr. Jansen said the first time around. This is exactly the type of rebuttal declaration that the Board should have considered and erred by not considering it. The last thing I'll say on his cross-appeal, which is the only thing he raised, was the level of ordinary skill in the art. And Judge Reyna, as you recognized, and as the Board recognized, and it goes through this at appendix page 19, 18, 20, it explains that the specification had so many references to words, to things like lexicography, that it was, quote, too numerous to recount. There was abundant evidence and certainly substantial evidence to support the Board's finding about the level of ordinary skill in the art. And unless the Court has any questions, I'll sit down. Okay, thank you. Thank you. Mr. Iconis? I haven't located that. I'm confident that the patent says that, but I haven't located it for you. Okay. That if I could... Yes, one minute. And then one more point on the... the Board's decision. In their decision, they construed, sui sponte and for the first time, the term lexical database. Of course, that term does not exist in the patents. It exists only in the prior art reference. So if... whatever definition they use, Google or MyBase, was using during the course of the trial, the PTAB trial, it is now in question because the construction is different from what the definition of was provided for in Conlon. So based on that... context... Okay, thank you. Thank both counsel. The case is submitted.